**Steven MORRISON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 10–90–062–CR.**

Court of Appeals of Texas,
Waco.

July 11, 1991.

Discretionary Review Granted
Nov. 21, 1991.

Anna K. Hanna, College Station, for appellant.

Bill R. Turner, Dist. Atty., James W. Locke, Asst. Dist. Atty., Bryan, for appellee.

Before THOMAS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

THOMAS, Chief Justice.

The issue is whether jurors should be allowed to pose written questions to witnesses during a criminal trial. Although not banning the practice entirely, we find an abuse of discretion and harm when the court allowed the prosecution to use a juror's question, which was never asked of a witness, to gain an unfair advantage in the trial. Accordingly, the judgment assessing Appellant a fifty-year sentence for murder is reversed and the cause remanded for a new trial.

### THE MURDER

Linda Johns brought Appellant to her house to exchange sex for drugs and locked the doors after they entered. Burglar bars covered the windows. What Johns apparently did not know was that Appellant had a schizotypal personality disorder, characterized by limited impulse control, poor judgment, suspiciousness, loss of control over temper and emotions, and feeling easily threatened. Marsha Harper, Johns's roommate, said that Appellant "panicked" after Johns refused to unlock the door and let him leave. Johns laughingly told Appellant, "Once you're locked behind these bars, you are locked here." Harper asked Johns to unlock the door because Appellant did not "look right," but she refused, saying "I'm going to mess with his mind." According to Harper, Appellant grabbed a "corkscrew thing," and he and Johns began fighting in a bedroom and hallway. Harper and Johns's children finally got out of the house and tried to summon help. Shortly thereafter, Appellant chased Johns out of the house with a butcher knife. He caught up with Johns

behind a nearby house and stabbed her to death, leaving the knife buried in her left temple. At trial Appellant claimed that he was insane and had acted in self-defense.

## THE PROCEDURE

During the preliminary instructions to the jury, the court told jurors that they could question witnesses. Questions were to be written and submitted to the judge, who would then determine their admissibility outside of the jury's presence. Counsel would be allowed to object to the questions. If a question were approved, the judge would read it to the witness exactly as written. Following the witness's answer, the attorneys could ask follow-up questions only on the subject matter of the question. If a question was not approved by the court, jurors were cautioned not to "surmise" that one of the attorneys had tried to keep it out. The procedure is similar to the one outlined in *United States v. Callahan*, 588 F.2d 1078, 1086 (5th Cir.1979). Appellant objected to the whole "process" on the ground that it is not authorized by law, but his objection was overruled.

## THE JUROR'S QUESTION

Detective Fickey, who investigated the crime scene, found "several drops of blood" in the hallway of Johns's house. A photograph of the blood was admitted into evidence. Following Fickey's testimony, a juror wanted to ask him this question: "Was any of the blood in the hall [Appellant's]?" Appellant objected that Fickey was not competent to answer the question and would have to base his answer on hearsay. The objection was sustained and the question was never asked.

Claiming that he intended but "forgot" to question Fickey about Appellant's "physical well being" on the night of the murder, the prosecutor immediately requested that he be allowed to recall Fickey. Appellant objected:

> Well, [Fickey's] already been passed and ... we allowed a juror to ask a question, that has obviously now stimulated another area that [the prosecutor] needs to cover. That is one of the problems I see with getting into juror's questions.... We would object on the grounds that [Fickey] has already been passed.

After the objection was overruled, the prosecutor asked Fickey whether he observed any "wounds, scratches or injuries" on Appellant on the night of the murder, to which Fickey answered "No."

Appellant attacks the practice of allowing jurors to question witnesses. Arguing that the procedure itself encourages jurors to become advocates rather than disinterested fact-finders, he contends the practice should be prohibited. Specifically, he sees error and harm in the court allowing the prosecutor to offer additional evidence after being "tipped off" by a juror's question that the State's proof was lacking on a material fact.

## SHOULD JURORS BE ALLOWED TO ALERT COUNSEL?

This quote from *United States v. Callahan* is featured in the two recent opinions which place Texas in the company of jurisdictions allowing jurors to question witnesses:

> There is nothing improper about the practice of allowing occasional questions from jurors to be asked of witnesses. If a juror is unclear as to a point in the proof, it makes good common sense to allow questions to be asked about it. If nothing else, *the question should alert trial counsel that a particular factual issue may need more extensive development.* Trials exist to develop truth. It may sometimes be that counsel are so familiar with a case that they fail to see problems that would naturally bother a juror who is presented with the facts the first time.

*Allen v. State*, 807 S.W.2d 639, 642 (Tex. App.—Houston [14th Dist.] 1991, no pet.) (quoting *Callahan*, 588 F.2d at 1086) (emphasis added); *Buchanan v. State*, 807 S.W.2d 644, 646 (Tex.App.—Houston [14th Dist.] 1991, no pet.). The principle implicit in the quote—that jurors need to be well-informed on the pertinent facts to determine truth and reach a fair and just ver-

dict—is indisputable in the abstract. What is bothersome, however, is the explicit acknowledgement that jurors should be allowed to *alert* counsel that additional evidence should be introduced on a material fact.

The first admonition the court gives a jury after its selection is "Do not talk to the lawyers." *See* TEX.R.CIV.P. 226a. The purpose of the instruction is to preserve the integrity of the jury and the judicial process, avoid the appearance of impropriety, and guarantee all parties a fair and impartial trial. Shut off from any communication with the jury, counsel for both sides are left to wonder what jurors are thinking and to speculate on what evidence the jury will find most persuasive. The instruction places both sides at an equal disadvantage in "reading the jury." What could be more helpful to counsel—particularly to a prosecutor—than to hear firsthand from jurors during the trial the things which concern them about the evidence? Questions are a form of communication, often signaling in subtle ways the questioner's unexpressed concerns, interests, desires or anxieties. Essentially, the *Callahan* court is encouraging *communication* between the jury and counsel during the trial, a practice which undermines the court's admonition: "Do not talk to the lawyers." Sanctioning this practice in a criminal case is particularly troubling.

A procedure which would encourage jurors to communicate directly with the prosecutor during the trial on matters of trial strategy, particularly on the type of evidence the prosecution should introduce or emphasize to ultimately persuade the jury on guilt-innocence or punishment, would be so patently and fundamentally unfair to the defendant that even the most state's-oriented advocate could scarcely condone it. Using the trial judge as a conduit for the communication would not remove or lessen the taint. Yet, if jurors can alert a prosecutor through questions that the state needs to introduce or "shore up" evidence on a particular matter—as the quote from *Callahan* condones and encourages—then what would be wrong with allowing a juror to tell the prosecutor, I am not yet convinced beyond a reasonable doubt on the defendant's identity as the person who committed the offense; the state should introduce more evidence bearing on that fact? Either way the juror is being allowed to *communicate* with the prosecutor.

If the state does not recognize that it needs to strengthen its proof on identity, and fails to do so, and if the jury has a reasonable doubt about the defendant's identity and ultimate guilt, then an acquittal will result. One must seriously question whether jurors should be allowed to assist either side in tipping the scales of justice.

### RISK OF HARM

Allowing jurors to question witnesses, even indirectly, carries an inherent risk of harm to a criminal defendant. *U.S. v. Nivica,* 887 F.2d 1110, 1123 (1st Cir.1989); *DeBenedetto v. Goodyear Tire & Rubber Co.,* 754 F.2d 512, 516 (4th Cir.1985). The danger is that the prosecutor, after discerning a juror's interest in certain facts or concern about a lack of evidence on a material fact, will use that information to gain an unfair advantage in the trial, either by improving the chances of obtaining a conviction in a marginal case or magnifying the punishment.

Under the procedure used by the trial court, questions are reviewed by counsel before the court rules on their propriety and admissibility. This is necessary to allow counsel to preserve error by timely objecting to a proposed question, a necessary prerequisite. *See* TEX.R.APP.P. 52(a). Consequently, regardless of how the court may rule on its admissibility, the prosecutor is aware of the question and all it may communicate about the juror's concerns.

### PROHIBIT THE PRACTICE OR CONTROL IT?

An overwhelming number of jurisdictions allow jurors to question witnesses but carefully monitor the practice for an abuse of discretion. *Allen,* 807 S.W.2d at 640–41. Appellant would have us outlaw

the practice entirely, arguing that it encourages jurors to become advocates rather than disinterested fact-finders. This we decline to do. Although we do not ban the practice, the inherent danger that the state will use a juror's question to gain an unfair advantage in the presentation of its case requires the closest scrutiny of the trial court's discretion whenever it allows jurors to pose questions to witnesses. Whenever the record gives the least appearance that the prosecution has gained an unfair advantage through the procedure used by the trial court, this court will not hesitate to find an abuse of discretion.

## FINDING AN ABUSE OF DISCRETION AND HARM

■ Essentially, Appellant's objection was that the court should not allow the prosecutor to recall Detective Fickey after being "tipped off" by the juror's question that the prosecution needed to strengthen its proof. The record is clear that this is what occurred. When the objection was overruled, the State essentially proved through Fickey's testimony that the blood in the hall had to be Lisa Johns's because Appellant had no observable "wounds, scratches or injuries." Thus, the record demonstrates that the prosecution obtained an unfair advantage from the juror's question.

Whether a witness should be recalled is within the court's discretion. *See Johnson v. State,* 583 S.W.2d 399, 405 (Tex.Crim. App. [Panel Op.] 1979); *Laws v. State,* 549 S.W.2d 738, 741 (Tex.Crim.App.1977). Here, the abuse of discretion occurred when the court allowed the State to use the "communication" from the juror to the prosecutor—"Please prove whose blood was in the hall"—to strengthen its case against Appellant by recalling Fickey. Although the court did not abuse its discretion merely by authorizing jurors to pose questions to witnesses, the error simply would not have occurred without the practice being authorized.

■ Having found an abuse of discretion, we do not proceed to a harm analysis because addressing the error itself answers the harm inquiry. *See Nunfio v. State,* 808 S.W.2d 482, 485 (Tex.Crim.App.1991). Logically, an appellate court cannot determine beyond a reasonable doubt that an unfair advantage which the state gained from a juror's question did not contribute to either conviction or punishment. Under the circumstances, a harmless-error analysis would be fruitless. *Id.* Consequently, point two is sustained, the judgment reversed, and the cause remanded for a new trial. The remaining points are not reached.

Recognizing that the practice has been approved in some form in every jurisdiction where the question has been considered, we refuse to ban it entirely but leave to the trial court's sound discretion whether and how jurors should be allowed to question witnesses in a criminal trial. Moreover, we accept the premise that jurors should be as well informed as possible to return just and fair verdicts. However, one cannot escape the reality that in this trial, other than setting the stage for reversible error, the practice was of negligible value to the jury. Considering the inherent risk of harm to the defendant from allowing any communication between the jury and the prosecutor during the trial, the practice's usefulness is highly questionable. The judicial resources of this state are strained to the limit. When balanced against the practice's marginal utility, the time and expense of a retrial and the possibility of another appeal seem a high price to pay for its continued use.